**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TANAYA WILLIAMS, ) | Case No. EDCV 17-0755-JPR |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM DECISION AND ORDER** |
| v. ) | **AFFIRMING COMMISSIONER** |
| ) | |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**I.    PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying her applications for Social Security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed December 6, 2017, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is affirmed.

## II.  BACKGROUND

Plaintiff was born in 1990.  (Administrative Record ("AR") 208.)  She completed one year of college (AR 38, 212) and worked in retail as a sales clerk and cashier (AR 37, 61-62, 212, 219-21).

On March 12, 2013, Plaintiff applied for DIB and SSI, alleging that she had been unable to work since November 1, 2007, because of anxiety, depression, and bipolar disorder.  (AR 66-67, 74-75, 182-96.)  After her applications were denied initially and on reconsideration (see AR 82-83, 114-15, 118, 121, 127), she requested a hearing before an Administrative Law Judge (AR 134).  A hearing was held on July 9, 2015, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert and Plaintiff's case worker.  (See AR 34-65, 181.)  In a written decision issued August 11, 2015, the ALJ found Plaintiff not disabled.  (AR 17-33.)  Plaintiff sought Appeals Council review (AR 13), which was denied on January 23, 2017 (AR 8-10).  This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).

It is more than a scintilla but less than a preponderance.
Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether
substantial evidence supports a finding, the reviewing court
"must review the administrative record as a whole, weighing both
the evidence that supports and the evidence that detracts from
the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715,
720 (9th Cir. 1998).  "If the evidence can reasonably support
either affirming or reversing," the reviewing court "may not
substitute its judgment" for the Commissioner's.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or has lasted, or is expected to
last, for a continuous period of at least 12 months.  42 U.S.C.
§ 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.
1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step evaluation process to assess
whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4),
416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir.
1995) (as amended Apr. 9, 1996).  In the first step, the
Commissioner must determine whether the claimant is currently
engaged in substantial gainful activity; if so, the claimant is
not disabled and the claim must be denied.  §§ 404.1520(a)(4)(i),
416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful

3

activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and her claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform her past work; if so, she is not disabled and the claim must be denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

substantial gainful work available in the national economy.
§§ 404.1520(a)(4)(v), 416.920(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257.
That determination comprises the fifth and final step in the
sequential analysis. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v);
<u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

     B.   <u>The ALJ's Application of the Five-Step Process</u>

     At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since November 1, 2007, the alleged
onset date. (AR 19.) At step two, he concluded that Plaintiff
had severe impairments of "mood disorder and polysubstance
abuse." (<u>Id.</u>) At step three, he determined that Plaintiff's
impairments did not meet or equal a listing. (AR 20.) At step
four, the ALJ found that Plaintiff had the RFC to perform a full
range of work at all exertional levels but with the following
nonexertional limitations: "[She] is limited to non-complex,
routine tasks; [she] cannot perform tasks requiring
hypervigilance; [she] cannot be responsible for the safety of
others; [she] cannot perform jobs requiring public interaction;
and [she] cannot perform jobs requiring significant teamwork."
(AR 21.) Based on the VE's testimony, the ALJ found that
Plaintiff could not perform her past relevant work. (AR 26.) At
step five, the ALJ concluded that given Plaintiff's age,
education, work experience, and RFC, she could perform three
representative jobs in the national economy. (AR 27-28.) Thus,
he found Plaintiff not disabled. (AR 28.)

**V.  DISCUSSION**

     Plaintiff argues that the ALJ improperly rejected the
opinion of psychiatrist Mehar Gill, a treating physician. (J.

Stip. at 4-11, 21.)  As discussed below, the ALJ properly

evaluated the medical-opinion evidence.  Accordingly, remand is

not warranted.

   A.   Applicable Law

   Three types of physicians may offer opinions in Social

Security cases: those who directly treated the plaintiff, those

who examined but did not treat the plaintiff, and those who did

neither.  Lester, 81 F.3d at 830.  A treating physician's opinion

is generally entitled to more weight than an examining

physician's, and an examining physician's opinion is generally

entitled to more weight than a nonexamining physician's.  Id.;

see §§ 404.1527, 416.927.[2]  But "the findings of a nontreating,

nonexamining physician can amount to substantial evidence, so

long as other evidence in the record supports those findings."

Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam)

(as amended).

   The ALJ may disregard a physician's opinion regardless of

whether it is contradicted.  Magallanes v. Bowen, 881 F.2d 747,

---

[2] Social Security regulations regarding the evaluation of
opinion evidence were amended effective March 27, 2017.  When, as
here, the ALJ's decision is the Commissioner's final decision,
the reviewing court generally applies the law in effect at the
time of the ALJ's decision.  See Lowry v. Astrue, 474 F. App'x
801, 804 n.2 (2d Cir. 2012) (applying version of regulation in
effect at time of ALJ's decision despite subsequent amendment);
Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir.
2004) ("We apply the rules that were in effect at the time the
Commissioner's decision became final."); Spencer v. Colvin, No.
3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1,
2016) ("42 U.S.C. § 405 does not contain any express
authorization from Congress allowing the Commissioner to engage
in retroactive rulemaking").  Accordingly, citations to 20 C.F.R.
§§ 404.1527 and 416.927 are to the versions in effect from August
24, 2012, to March 26, 2017.

751 (9th Cir. 1989); see Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008). When a physician's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for a "clear and convincing" reason. Magallanes, 881 F.2d at 751; Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only a "specific and legitimate reason" for discounting it. Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). The weight given a treating or examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6). Those factors also determine the weight afforded the opinions of nonexamining physicians. §§ 404.1527(e), 416.927(e). The ALJ considers findings by state-agency medical consultants and experts as opinion evidence. Id.

Furthermore, "[t]he ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004). An ALJ need not recite "magic words" to reject a physician's opinion or a portion of it; the court may draw "specific and legitimate inferences" from the ALJ's opinion. Magallanes, 881 F.2d at 755. The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." Ryan v. Comm'r of Soc. Sec.,

7

528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

B. <u>Relevant Background</u>

1. <u>Dr. Gill</u>

Dr. Gill first saw Plaintiff in November 2012. (<u>See</u> AR 295-96, 298; <u>see also</u> AR 297-301 (Plaintiff's preappointment assessment with clinical therapist).)[3] Her "chief complaint" was "mood swings," with "period[s] of depression" and then "periods of [increased] energy, irritability, and anger" (AR 295); he diagnosed her with bipolar disorder (AR 296). He observed that her appearance, hygiene, behavior, speech, mood and affect, thought process and content, and memory were "w[ithin] n[ormal] l[imits]." (<u>Id.</u>) He indicated that she had auditory hallucinations — it is unclear whether he observed her having hallucinations or she reported them — and "fair" insight and judgment. (<u>Id.</u>) He prescribed Zoloft,[4] Abilify,[5] and trazodone.[6] (AR 286, 296.)

Later that month, Dr. Gill saw Plaintiff "for med[ication]." (AR 294.) She complained of unspecified side effects from

---

[3] The majority of Dr. Gill's treatment notes are hard to read or illegible (<u>see</u> AR 287-96, 304-05); the Court's summary is limited to what it could actually read.

[4] Zoloft treats depression and may improve a patient's mood, sleep, appetite, and energy level and decrease fear, anxiety, unwanted thoughts, and frequency of panic attacks. <u>See</u> <u>Zoloft</u>, WebMD, https://www.webmd.com/drugs/2/drug-35-8095/zoloft-oral/sertraline-oral/details (last visited June 1, 2018).

[5] Abilify is an antipsychotic used to treat bipolar disorder. <u>See</u> <u>Abilify</u>, WebMD, https://www.webmd.com/drugs/2/drug-64439/abilify-oral/details (last visited June 1, 2018).

[6] Trazodone is used to treat depression. <u>See</u> <u>Trazodone HCL</u>, WebMD, https://www.webmd.com/drugs/2/drug-11188-89/trazodone-oral/trazodone-oral/details (last visited June 1, 2018).

8

Abilify and stated that she "still ha[d] mood swings," got

"anxious [and] overwhelmed at times," and experienced auditory

hallucinations. (Id.) Plaintiff's compliance with her

medication plan was "fair to poor." (Id.) Dr. Gill discontinued

her prescriptions for Zoloft and Abilify and prescribed Risperdal[7]

and Prozac[8] instead. (Id.; see AR 286.)

In December 2012, Plaintiff "denie[d] any manic symptoms"

but stated that she got "depressed more frequently." (AR 293.)

Her compliance with medication was "good," but she said she still

heard voices, had paranoia, and slept "12-14 h[ours]/day." (Id.)

Dr. Gill referred her to therapy. (Id.) In January 2013,

Plaintiff arrived at her appointment "[n]eatly dressed" and

"well-groomed." (AR 292.) She had "good" compliance with her

medication plan but "still ha[d] mood swings," "depression," and

"crying spells." (Id.) She said she was experiencing auditory

hallucinations but not command hallucinations. (Id.) In

February 2013, Plaintiff "denie[d] any manic symptoms [or]

depression" but had decreased energy and motivation. (AR 291.)

She was not fully compliant with her medication; Dr. Gill noted

that she "did not take Risperdal regularly." (Id.) In March

2013, her compliance remained "poor" and she "ha[d] not been

taking Risperdal." (AR 290.) "She [was] also paranoid" and

---

[7] Risperdal, which is used to treat such mental disorders as schizophrenia and bipolar disorder, can help patients think clearly and take part in everyday life. See Risperdal, WebMD, https://www.webmd.com/drugs/2/drug-9846/risperdal-oral/details (last visited June 1, 2018).

[8] Prozac is used to treat depression. See Prozac, WebMD, https://www.webmd.com/drugs/2/drug-6997/prozac-oral/details (last visited June 1, 2018).

"distressed" but denied suicidal thoughts. (Id.) Plaintiff was "unable to explain [her] side effects" but stated that she felt like she was "in a bal[l]oon." (Id.) She said she "d[id] not want to take Risperdal," so Dr. Gill discontinued it and trazodone and prescribed Seroquel.[9] (Id.; see AR 286.)

On April 11, 2013, Dr. Gill completed a mental-capacity assessment of Plaintiff. (AR 279-81.) He opined that Plaintiff had "[m]arked" limitations remembering locations and worklike procedures; understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities on a schedule; maintaining regular attendance; being punctual within customary tolerances; working in coordination with or in proximity to others; and completing a normal workday or workweek without interruptions from psychologically based symptoms. (AR 279-80.) She would have "4+" absences in an average month. (AR 280.) She also had "[m]arked" limitations interacting appropriately with the general public, accepting instructions and responding appropriately to criticism, getting along with coworkers or peers without distracting them or exhibiting behavior extremes, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, responding appropriately to changes in the work setting, setting realistic goals, and making plans independently of others. (AR 280-81.)

She had no limitations understanding, remembering, and

---

[9] Seroquel is an antipsychotic used to treat such mental conditions as bipolar disorder. See Seroquel, WebMD, https://www.webmd.com/drugs/2/drug-4718/seroquel-oral/details (last visited June 1, 2018).

carrying out very short, simple instructions; asking simple
questions or requesting assistance; or being aware of normal
hazards and taking appropriate precautions.  (AR 279-81.)  And it
was "[u]nknown" whether she could sustain an ordinary routine
without special supervision, make simple work-related decisions,
perform at a consistent pace with a standard number and length of
rest periods, travel in unfamiliar places, or use public
transportation.  (Id.)  He explained that the limitations stemmed
from her "poor conc[entration] and attention, forgetfulness,
psychotic symptoms," "mood swings, depression," "paranoia, [and]
hallucinations."  (See id.)  Dr. Gill noted that alcohol had no
impact on his assessment of Plaintiff's mental capacity.  (AR
281.)  He also opined that she could not "manage benefits in
. . . her own best interest" but did not explain why not.  (Id.)

        Later in April — two weeks after Dr. Gill filled out the
mental-capacity assessment — Plaintiff's compliance with
medication had returned to "good," and she reported "feeling much
better now."  (AR 289.)  She was "less depressed" and "denie[d]
any crying spells," and she said her auditory hallucinations were
"also less."  (Id.)  Though she still had "paranoia," Dr. Gill
wrote that she "show[ed] improvement."  (Id.)  In May 2013,
Plaintiff was "neatly dressed" and "well groomed," and she stated
that she was "feeling good."  (AR 288.)  Her depression was
"less," with "no crying spells," but she still got angry and
frustrated "easily."  (Id.)  Her "sleep [was] better," her
medication compliance was "good," and she "show[ed] improvement."
(Id.)

        In July 2013, Plaintiff was "neatly dressed," "well

11

groomed," "calm," and "pleasant." (AR 287.) Her "mood swings [were] less severe [and] less frequent," and her auditory hallucinations were "also less." (Id.) Her "sleep [was] good," and she reported "no [side effects]" from her medications. (Id.) Her compliance was "good," and she still was "showing improvement." (Id.) By October 2013, however, her compliance was "poor," she "was using marijuana," and she had recently been hospitalized. (AR 305; see AR 335-36, 395-99.) She had "major mood swings" but "sleep [was] ok." (AR 305.) In November 2013, she "show[ed] improvement" and had "good" compliance with her medication plan. (AR 304.) She reported that she was "doing better," her "anger outbursts [were] less," and her "mood swings [were] less severe." (Id.) Her "sleep [was] better," although she was "depressed again." (Id.) She said her auditory hallucinations were "also less [and] not command." (Id.)

On June 5, 2014, seven months after his last appointment with Plaintiff in the record, Dr. Gill completed a medical-source statement. (See AR 584-88.) He noted that the onset date of Plaintiff's condition was November 1, 2012, and opined that she was not "able to work." (AR 584.) Her symptoms, which included "auditory hallucinations, paranoia, mood swings, depression, low frustration tolerance, poor conc[entration], [poor] attention, [and] forgetfulness," "interfere[d] [with her] daily functioning." (AR 588.) She was "unable to socialize" because of those symptoms. (Id.) Dr. Gill indicated that she could "follow simple instructions but [could] not follow complex instructions" because she had difficulty "sustain[ing] attention for a long time." (Id.) Regarding Plaintiff's ability to adapt

12

to worklike situations, Dr. Gill stated that she got "frustrated easily" and "ha[d] poor decision-making" skills. (Id.) "She [would] miss work for more than 5-6 days a month if she [was] working," he wrote. (Id.) A year later, on June 19, 2015, he filled out another medical-source statement, assessing Plaintiff with the same limitations. (See AR 590-91.) He apparently had not seen or treated Plaintiff in the interim.

2. Additional clinical notes

Plaintiff admitted herself to the hospital for a voluntary psychiatric evaluation on July 9, 2012. (AR 317-26.) She was "overwhelmed," had "mood swings, anxiety, [and] nightmares," and "want[ed] med[ication] to stabilize [her] mood." (AR 324; see AR 318.) She reported that she hadn't been to therapy in eight months. (AR 320.) Hospital personnel referred Plaintiff to an "outp[atient] psych clinic," and she was discharged home in "stable" condition that same night. (AR 323, 326.)

Plaintiff apparently was treated at Inland Family Community Health Center beginning in September 2012. (See AR 532-33.) She had no "hallucinations," "agitation," "delusions," or "suicidal tendencies." (AR 533.) Her "mood was euthymic," "affect was normal," and thought processes and content "were not impaired." (Id.) In October 2012, she denied suicidal thoughts or plans or hallucinations. (AR 529.) She stated that her "medication for depression [was] working well." (Id.) She was found to be "[a]lert, oriented to time, place, and person, well developed, and well nourished." (AR 530.) Her "mood was euthymic," she "was not depressed," her "affect was normal," and she "was not tearful" or "agitated." (Id.) In November and December 2012 and

January 2013, she was again "[a]lert, oriented to time, place, and person, well developed, and well nourished," and her "affect was normal." (AR 522-28.)  In February 2013, Plaintiff complained of neck and throat pain from a recent car accident. (AR 519-21.)  She "reported no psychological symptoms," however, and her "affect was normal." (AR 521.)  Her general appearance was "normal, alert, oriented to time, place, and person, well developed, and well nourished." (Id.)  In June 2013, Plaintiff reported debilitating headaches and discussed stress management with her provider but mentioned no psychological symptoms. (AR 515-18.)

On September 30, 2013, Plaintiff was admitted to the hospital because she "was stabbing herself with a pen." (AR 335-36; see AR 395-99, 416.)  She had become upset when, after seeking therapy because she had been raped by her boyfriend three days earlier, her primary therapist was unavailable. (AR 366, 368-69, 384, 398.)  Though she "lost her temper," she "did not intend to kill herself" (AR 366), and she claimed that she had "been experiencing command auditory hallucinations telling her to harm herself" and felt "like she must comply" (AR 368).  She was "very depressed and tearful" but with "logical thought formation." (Id.)  She denied any illicit substance abuse (id.) but tested positive for marijuana (AR 366).  She was "stable" and discharged to her family the next day. (AR 347, 366, 402.)

Plaintiff didn't return to the Inland Family Community Health Center until May 2014, close to a year after her last visit; at that time, she reported depression and a "change in personality." (AR 511-14.)  Her provider found that her "affect

14

was normal," and she was "alert, oriented to time, place, and person, well developed, and well nourished." (AR 513.) She was counseled about "stress management" and the "proper use of medications." (Id.) In July and August 2014, she was noted as "[a]lert, oriented to time, place, and person, well developed, and well nourished." (AR 502-10.)

In January 2015, Plaintiff had anxiety, but it "d[id] not interfere with work"[10] or cause her to "feel[] restless." (AR 498-500.) Her "mood was depressed," but she was "[n]ot crying for no reason." (AR 498, 500.) She was assessed with fatigue, but her sleep patterns were "normal" and she didn't feel tired. (Id) She reported "[n]ormal enjoyment of activities, no low self-esteem, and [the] ability to make decisions." (AR 498.) She was "[a]lert, oriented to time, place, and person, and well developed." (AR 500.) Her "grooming was normal," "affect was not agitated," and "thought content revealed no impairment" or "delusions." (Id.) In March 2015, she reported experiencing "no psychological symptoms" and was not feeling tired but stated that, on a scale of zero to three, she ranked at three for "[l]ittle interest or pleasure in doing things" and "[f]eeling down, depressed, or hopeless."[11] (AR 495-96.) In April 2015, she still reported feeling "[l]ittle interest or pleasure in doing things," but no other psychological issues were recorded. (See

---

[10] It is not clear what "work" Plaintiff was referring to.

[11] A patient health questionnaire is used to monitor the severity of depression and response to treatment. See Patient Health Questionnaire (PHQ-9), Patient, https://patient.info/ doctor/patient-health-questionnaire-phq-9 (last visited June 1, 2018). A score of zero means "not at all"; a score of three means "nearly every day." Id.

AR 490-92.)

3. <u>Dr. Krieg</u>

On March 4, 2015, psychologist Charlene K. Krieg conducted a psychological evaluation of Plaintiff. (AR 306-11.) She also completed a medical-source statement. (AR 312-14.) At the appointment, Plaintiff was "oriented to time, place, and purpose of the visit." (AR 308.) She was "cooperative" and "able to understand test questions and follow directions." (AR 309.) Although Plaintiff alleged "hearing voices," Dr. Krieg observed that she "did not exhibit visual tracking behaviors typical of individuals responding to internal stimuli." (AR 307.) Plaintiff "described herself as being in a manic mood during the evaluation" but "appeared calm with slightly slowed speech and slightly slowed response times." (<u>Id.</u>) She "presented with reserved mood and constricted affect," and her "level of insight and social judgment appeared to be within normal limits." (AR 309.) Her level of intellectual functioning was in the "low-average range." (AR 310.) Further, her performance on "attention/concentration tasks that measure simple visual scanning and sequencing abilities" was in the "normal to mild deficit range," and her performance on "attention/concentration tasks that require the manipulation of complex information" was in the "low-average to borderline range." (<u>Id.</u>) Dr. Krieg opined that Plaintiff had "no mental impairment that would limit her ability to engage in work activities and complete a normal workday or workweek." (AR 311; <u>see</u> AR 312-14.)

16

## 4.  State-agency reviewer

In February 2014, Plaintiff's medical records were reviewed by state-agency psychologist Therese Harris. (See AR 93-95, 108-10.)  She found Plaintiff not disabled (AR 97, 112) and assessed functional limitations in understanding and memory, concentration and persistence, social interaction, and adaptation (AR 93-95, 108-10).

She was "[n]ot significantly limited" in her ability to remember locations, worklike procedures, or "very short and simple instructions"; carry out "very short and simple" or detailed instructions; maintain attention and concentration "for extended periods"; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Id.) She was "[m]oderately limited" in her ability to "understand and remember detailed instructions"; perform activities on a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along

with coworkers or peers without distracting them or exhibiting behavior extremes; and respond appropriately to changes in the work setting. (AR 93-94, 108-09.) Dr. Harris opined that Plaintiff was "[a]ble to maintain focus, pace, and persistence for simple tasks for 2-hour periods over an 8-h[ou]r workday within a normal 40-hour work schedule." (AR 94, 109.) She also stated that Plaintiff could "adequately manage interaction with the public" and "appropriate interpersonal interactions in the workplace" and could "accept reasonable supervision." (Id.)

C. Analysis

The ALJ gave "little weight" to Dr. Gill's opinion, which indicated "generally marked functional limitations" and "conclu[ded] that [Plaintiff] was unable to work." (AR 24; see AR 279-81, 584-88, 590-91.) Because his opinion was contradicted by the less restrictive opinions of Dr. Krieg (see AR 306-11) and the state-agency reviewer (see AR 93-95, 108-110; see also AR 25), the ALJ was required to provide only a "specific and legitimate reason" for rejecting it. See Carmickle, 533 F.3d at 1164. He did so.

First, the ALJ discounted Dr. Gill's opinion because it was "not supported by objective evidence" and was "inconsistent with the record as a whole." (AR 24.) Plaintiff contends that this assertion was "legally and factually flawed." (J. Stip. at 7-8.) On the contrary, the ALJ did not err. Inconsistency with the objective medical evidence can be a specific and legitimate reason for rejecting a medical-source opinion. See Batson, 359 F.3d at 1195 (lack of "supportive objective evidence" and "contradict[ion] by other statements and assessments of

18

[plaintiff's] medical condition" were "specific and legitimate reasons" to discount physicians' opinions); Kohansby v. Berryhill, 697 F. App'x 516, 517 (9th Cir. 2017) (upholding inconsistency with medical-opinion evidence as specific and legitimate reason for rejecting medical opinion (citing Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008))).

As noted by the ALJ, although Plaintiff's "treating physicians support[ed] allegations of disabling symptoms," "the actual treatment records show she [was] generally doing better with decreased mood swings and better sleep when she [was] compliant with medication." (AR 26; see AR 24 (ALJ stating that evidence showed "generally normal findings when compliant with medication").) Plaintiff's compliance with her medication plan wavered, but Dr. Gill often recorded that when her compliance was "good," she "show[ed] improvement." (See AR 287 (July 2013), 288 (May 2013), 289 (Apr. 2013), 304 (Nov. 2013). But see AR 292 (Jan. 2013: "good" compliance but no assessment of "improvement"), 293 (Dec. 2012: same).) Plaintiff reported "feeling much better" when she was compliant with medication. (AR 289.) In April 2013, for example, she was "less depressed," "denie[d] any crying spells," and had "less" auditory hallucinations. (Id.; see also AR 288 (May 2013: depression "less" and "no crying spells"), 287 (July 2013: mood swings "less severe [and] less frequent").) Her compliance was "poor" in October 2013 when she was hospitalized and tested positive for marijuana (see AR 305, 335-36, 395-99), but by the next month it was again "good" and, as a result, she was "doing better," her "anger outbursts [were] less," and her "mood swings [were] less

19

severe" (AR 304).  See Warre v. Comm'r of Soc. Sec. Admin., 439
F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be
controlled effectively with medication are not disabling for the
purpose of determining eligibility for SSI benefits.")

        Further, Dr. Gill's opinion of generally marked functional
limitations was inconsistent with Plaintiff's progress notes from
Inland Family Community Health Center, which show mostly stable
mental-health symptoms.  She was regularly "alert, oriented to
time, place, and person, [and] well developed" (see AR 496 (Mar.
2015), 500 (Jan. 2015), 503 (Aug. 2014), 510 (July 2014), 513
(May 2014), 521 (Feb. 2013), 522 (Jan. 2013), 524 (Dec. 2012),
528 (Nov. 2012), 530 (Oct. 2012), 533 (Sept. 2012)),
contradicting Dr. Gill's finding that she would have "[m]arked"
limitations in maintaining attention and concentration (AR 279,
588, 591).  See Debbs v. Astrue, No. 2:11-cv-02394 KJN, 2012 WL
5544077, at *8 (E.D. Cal. Nov. 14, 2012) (finding that
physician's opinion that plaintiff had "difficulty in paying
attention" was contradicted in part by treatment records
indicating she was "alert").  Plaintiff's reports to the health
center often directly contradicted Dr. Gill's treatment notes
from the same point in time.  (Compare AR 294-95 (Nov. 2012:
Plaintiff reporting to Dr. Gill mood swings, anxiety, depression,
and crying spells, among other things), with AR 530 (Oct. 2012:
health center noting that Plaintiff's "mood was euthymic and was
not depressed"), and AR 527 (Nov. 2012: Plaintiff reporting "no
psychological symptoms" to health center).)  And even when
Plaintiff was assessed with fatigue and depression by the health
center, her symptoms were mild.  (See AR 498, 500.)  Her anxiety

"d[id] not interfere with work," and she was "[n]ot crying for no reason." (AR 498.) She had "[n]ormal enjoyment of activities, no low self-esteem, and [the] ability to make decisions." (Id.) Moreover, her "thought content revealed no impairment and no delusions." (AR 500.)

Dr. Gill opined that Plaintiff's ability to work was impaired by "forgetfulness" (see AR 279-80, 588), but the psychological tests conducted by Dr. Krieg showed that her working memory was "within normal limits" and her immediate, recent, and remote memories were all "[i]ntact" (AR 309). He indicated "[m]arked" limitation in her ability to "adhere to basic standards of neatness and cleanliness" (AR 280) but noted more than once in his own treatment notes that she was "[n]eatly dressed" and "well-groomed" (see AR 287-88, 292), never indicating otherwise.[12] Similarly, Dr. Gill found that Plaintiff was "unable to socialize" (AR 588), but she apparently had a boyfriend for at least some portion of the relevant period, although he was alleged to have been abusive (AR 297, 301). These inconsistencies diminish the reliability of Dr. Gill's opinion. (See AR 23-24); see also Williams v. Berryhill, 710 F. App'x 320, 321 (9th Cir. 2018) (affirming ALJ's discounting of treating physician's opinion because "medical record as a whole was inconsistent with the degree of limitations" assessed).

Thus, despite the fluctuating symptoms pointed out by

---

[12] Plaintiff's preappointment assessment, completed by a clinical therapist, not Dr. Gill, contradicts itself on the issue of Plaintiff's appearance; it states both that she had "good hygiene and grooming" (AR 300) and that she "neglect[ed] hygiene and grooming" when she was "depressed" (AR 297).

Plaintiff (see J. Stip. at 7-10), many of which were attributable
to her medication compliance or lack therof, the ALJ's conclusion
that the objective medical record did not support and was
inconsistent with Dr. Gill's opinion of generally marked
limitations was rational and supported by substantial evidence.
See Ryan, 528 F.3d at 1198 ("'Where evidence is susceptible to
more than one rational interpretation,' the ALJ's decision should
be upheld." (citation omitted)); Andrews v. Shalala, 53 F.3d
1035, 1039 (9th Cir. 1995) ("The ALJ is responsible for
determining credibility, resolving conflicts in medical
testimony, and for resolving ambiguities."). He appropriately
discounted Dr. Gill's opinion for that specific and legitimate
reason.  See Batson, 359 F.3d at 1195; Kohansby, 697 F. App'x at
517.

Second, the ALJ found that "the conclusion that [Plaintiff]
was unable to work [had] no probative value." (AR 24.) Opinions
such as Dr. Gill's that Plaintiff was not "able to work" (AR 584,
590) are reserved to the Commissioner and "can never be entitled
to controlling weight or given special significance." SSR 96-5p,
1996 WL 374183, at *5 (July 2, 1996); see §§ 404.1527(d)(1),
416.927(d)(1) ("A statement by a medical source that you are
'disabled' or 'unable to work' does not mean that we will
determine that you are disabled."). Plaintiff argues that Dr.
Gill's finding on an issue reserved to the Commissioner "does not
discharge the ALJ from considering those opinions." (J. Stip. at
8-9.) But as Defendant points out, in addition to rejecting Dr.
Gill's conclusions on disability, the ALJ "specifically addressed
[his] statements" and "explained why the evidence did not support

22

the severe limitations he assessed." (Id. at 12-13 (citing AR

24); see AR 23.)  As discussed above, the fact that Dr. Gill's

opinion was "not supported by objective evidence" and

"inconsistent with the record as a whole" was a specific and

legitimate reason to discount it.  See Batson, 359 F.3d at 1195

("ALJ did not err in giving minimal evidentiary weight to the

opinion[] of [plaintiff's] treating physician[]" in part because

opinion "did not have supportive objective evidence").

Finally, the ALJ discounted Dr. Gill's opinion because he

"primarily summarized [Plaintiff's] subjective complaints" and

"did not provide clinical findings to support [his] functional

assessment." (AR 24.)  This was a proper reason for rejecting

his opinion.  Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir.

2005) (affirming rejection of physician's opinion that plaintiff

"suffers from bipolar disorder" when it "was not supported by

clinical evidence and was based on [plaintiff's] subjective

complaints").  Plaintiff contends that because "mental health

professionals 'frequently rely on the combination of their

observations and the patient's reports of symptoms,'" it was

inappropriate to discount Dr. Gill's opinion on that basis.  (J.

Stip. at 9-10 (quoting Ferrando v. Comm'r of Soc. Sec. Admin.,

449 F. App'x 610, 612 n.2 (9th Cir. 2011); Ryan, 528 F.3d at

1199-1200).)  Indeed, Ferrando discourages an ALJ's discrediting

of "a mental health professional's opinion solely because it is

based to a significant degree on a patient's 'subjective

evaluations.'"  449 F. App'x at 612 n.2.  But in that case, the

ALJ gave no adequate reason to discount the plaintiff's

subjective statements and thus could not "rely on any defect in

23

those 'subjective allegations' to discredit the treating psychiatrist." Id. at 612.  In contrast, the ALJ here found Plaintiff's subjective symptom statements "less than fully credible" (AR 22), which she has not challenged on appeal. Moreover, the ALJ did not discredit Dr. Gill's opinion "solely" because it was based on Plaintiff's subjective symptoms, further distinguishing Ferrando.  And unlike Dr. Krieg (see AR 306, 309-10 (conducting several psychological tests)), Dr. Gill does not appear to have performed any objective psychological tests to support his assessment of Plaintiff's functional limitations (see generally AR 279-96, 302-05).

Accordingly, the ALJ did not err in assessing Dr. Gill's opinion.  Substantial evidence supports the ALJ's decision.  As such, remand is not warranted.  See Batson, 359 F.3d at 1195; Kohansby, 697 F. App'x at 517.

**VI.  CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[13] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and in Defendant's favor.


DATED: June 4, 2018           **JEAN ROSENBLUTH**
                              _____
                              JEAN ROSENBLUTH
                              U.S. Magistrate Judge



_____

[13] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."